[No. 29364. Department Two. December 20, 1944.]

THE CITY OF SEATTLE, *Respondent*, v. JIM DEMOS, *Appellant.*[1]

[1]Reported in 154 P. (2d) 597.

*John F. Garvin,* for appellant.

*A. C. Van Soelen* and *Glen E. Wilson,* for respondent.

ROBINSON, J.—The appellant, Jim Demos, was convicted in the Seattle municipal court of violating a Seattle ordinance. The charge, omitting formal parts, was worded as follows:

"Then and there being the said defendant did wilfully and unlawfully possess and sell alcoholic liquor on the premises at 67½ Yesler Way, all of which is contrary to Ordinance No. 69284, of the City of Seattle, entitled 'An Ordinance controlling the sale, manufacture, possession of alcoholic liquor in the City of Seattle, contrary to the State Liquor Act.'"

The defendant appealed to the superior court of King county, and the cause was heard by that court sitting without a jury. At the close of the trial *de novo,* the defendant was again found guilty. The post-trial motions having been made and denied, the judgment and sentence appealed from was entered, requiring the defendant to pay a fine of one hundred fifty dollars and costs and to serve thirty days in the city jail.

Ordinance No. 69284 is very inclusive. It not only makes it a misdemeanor to possess or sell, as therein defined, but also to possess and sell, "except as authorized or permitted by the provisions of" the Washington state liquor act (Laws of 1933, Ex. Ses., chapter 62, p. 173). It further provides that the description of any offense under the ordinance shall be sufficient in law if made in the language of the ordinance. There is a similar provision in the state liquor act.

For the most part, the errors assigned relate to factual matters. Assignment No. 5 seems to raise the question of law chiefly relied on. It is therein assigned that: "The Court erred in holding that an offense was charged in the complaint."

The court held that the offense was charged in the language of the ordinance, but the appellant contends that, even so,

"Certainly, this complaint did not apprise the appellant

of the nature of his charge, and could only confound and confuse a defendant charged in such complaint."

We are not able to find that the appellant was thus prejudiced. If, as we think most unlikely, he went to trial in the municipal court uncertain and confused as to the charge, his uncertainty and confusion must have then and there been thoroughly dissipated. From his experience in that court, he undoubtedly knew just what to expect in the *de novo* trial in the superior court. In ruling upon the assignment, we think it sufficient to quote from the opinion in *State v. Vane,* 105 Wash. 170, 174, 177 Pac. 728:

" . . . it may be that the information would not meet the tests of the common law, but we have endeavored to relax the rigidity of those rules. When fair trials were the exception rather than the rule, it was but natural that judges, having a sense of right and humanity, should hold the state to strict pleading and to a stricter proof; but in these times, when those charged with crime are protected by every constitutional and statutory guaranty of a fair trial that a sense of humanity can suggest, and by a general sentiment that no innocent man shall be convicted of crime—when education is general, and understanding of written words is common to all classes, there is no sound reason why the rigorous rule of the common law should be adhered to as a rule of construction in criminal pleadings."

(For an earlier statement by this court to the same effect, see the opinion in *State v. Wright,* 9 Wash. 96, 37 Pac. 313.)

The only substantial question presented by the remaining assignments is whether the evidence warrants the conviction. All of the state's witnesses were members of the Seattle police force. The substance of their testimony will be given. Sergeant Tembreull testified that, the department having reason to believe that liquor was being sold at 67½ Yesler Way, he was assigned to investigate the matter, but the outer door was always locked. He hung around the Yesler Tavern just across the alley in an endeavor to make the acquaintance of someone having an entree. Having found such a man in the person of Jim

Buck, he made his acquaintance, and, while drinking beer with him, expressed his distaste for that beverage and asked Buck if he could get him some whiskey. Buck said he could. Tembreull gave Buck two one-dollar bills which Sergeant Richardson had previously furnished him. He watched Buck cross the alley and enter the Baranoff. After some ten or fifteen minutes, Buck came out of the hotel and returned to the tavern with a Coca Cola bottle. The officer took it to the men's room to determine whether it contained whiskey and found that it did.

While this was going on, four other officers, Sergeant Richardson, who had furnished the bills and kept a record of their serial numbers, Sergeant Jordan, Sergeant Westman, and Officer McCain, were observing from shadowed points directly across the street. Three of these officers testified in the case. Two of the three testified that they could see into the Yesler Tavern and saw Tembreull talking to Buck. The other was doing something about the car at the time. These two testified that they saw Buck go to the Baranoff and shortly after return to the tavern. All three testified that Tembreull came out shortly after and walked up the street, and that, before he was out of sight, the defendant came out of the Baranoff and went in the same direction. Officer McCain arrested him.

All three officers testified that he denied any wrongdoing and invited them to come up to his room. They accepted the invitation. The stairway landing thereto was closed by a locked door which Demos opened with a key. It was later found that, when one pressed the button at that door, it activated a bell in the defendant's room. There was a large closet in the room itself, containing a table and three chairs. There was a whiskey bottle in the room, nearly empty, and scattered about were a number of mixer bottles, most of them empty. After looking around, the officers exhibited a search warrant and asked Demos to open the drawer of a dresser which had a slot cut in the top immediately above the drawer. He did so, revealing a considerable amount of bills and silver. On top of the heap were two twice-folded bills. They were unfolded, and their

serial numbers compared with the record which Richardson had of the bills furnished to Tembreull. The serial numbers were identical. The testimony of the officers vary as to what Demos replied when asked to explain how the bills got there. One says he shrugged his shoulders and said: "They must have dropped from the sky." Another said, "from the roof," and the third, "from the ceiling."

It was further testified that two keys on a ring hung on the doorjamb. When asked about them, Demos said they were his and belonged to a room which he had upstairs. Three of the officers found the landlady on that floor who showed them all the rooms but one. They unlocked that one with one of the keys taken from the defendant's room, and found therein an old padlocked trunk which they unlocked with the other. It contained fifty-four pints of whiskey, fourteen bottles of rum, and some brandy. The officers took the liquor and the padlock, but left the trunk itself in the room. When they brought the liquor downstairs to the defendant's room, he admitted that it was his.

While the primary question here is whether the circumstances shown are sufficient to support the conviction, it will be found useful to analyze the defense also, for in many respects it corroborates the testimony given on behalf of the state, and on the whole was rather harmful than helpful to the defendant's cause.

Herman Westlink, proprietor of the Baranoff, was first called and testified that the liquor found in the trunk was his, he having purchased it from time to time from a state liquor store. He identified the padlock that had been taken from the trunk and was already in evidence, saying that he was quite sure it was his. He claimed, however, that Demos could have had no key that would open it, but only his own private key would do so, and that the trunk itself showed that the officers had gotten the whiskey out of it, not by unlocking the padlock, but by prying off the hasp. At this point, it was time for intermission. He was asked to bring his private key in the afternoon. The key he brought would not unlock the padlock. The key the state had in-

troduced, as having been found in the defendant's room, did.

The defendant's second witness was the man whom Tembreull sent out of the tavern to get him some whiskey. He was introduced as follows:

"By Mr. Garvin: Q. Jim, it has been a long time since we have met again. What do you do? A. Still working on the waterfront. The Court: What is his name? Mr. Garvin: Jim Buck."

His story as to his dealings with Tembreull corresponds with that officer's up to the point when the witness returned with the whiskey, then he says that the officer, another man, and himself went to the men's room and drank all of it, and that he put the bottle in the empty bottle rack. He testified, most positively, that no purchase or sale occurred, that he bought no whiskey from Demos or anyone else, that he went up and got it from a seafaring friend who lived in the Baranoff and would not accept any money for it. Coming out of his friend's room, he met the landlady, Mrs. Westlink, and happened to remember that he owed the defendant two dollars, so he said to her: "If you see Jim, give him these two dollars I owe him, not for whiskey because I have not seen Jimmy Demos." He testified, and several times repeated, that all this occurred about six-thirty in the evening.

The next witness called was the alibi witness, E. R. Dickson. An abstract of the salient parts of his testimony would destroy its peculiar flavor. We therefore quote:

"By Mr. Garvin: Q. Will you state your name? A. E. R. Dickson. Q. Dick, you are an old friend of mine, but that wouldn't make any difference in this case, would it? A. Not in the least. Q. You are an old professional baseball player, injured, I think, and now are suffering from a cancer of the throat? A. That is correct. Q. Do you know Jim Demos? A. Yes. Q. Do you remember when he was arrested? A. Yes, I do. Q. Did you see him that night? A. Yes, I did. Q. Tell the Court what you know about this case. A. Well, your Honor, I was sitting in the City Grill, over there, where a great many presiding judges and so forth come in. I looked over and I saw Mr. Garvin there, the attorney for the defense; and this gentleman down here,—

I know his name is Herman [apparently Herman Westlink] —and Mr. Demos sitting over there. And I said, 'Well, it looks like a party over there.' And he said, 'No, Jimmie Demos was arrested last night.' I said, 'For what?' 'Well, for selling liquor.' I said, 'When did this happen?' and he said, 'Well, I don't know; around about eight-thirty or nine o'clock.' and I said, 'That can't be because I was sitting with him eating.' There was a lunch counter there, and I said 'He was sitting right alongside me.' 'Well,' he said, 'he was.' And I said, 'Well, if he was, he couldn't be in two places at once.' This was along about last August, if I remember correctly."

During his cross-examination, Mr. Dickson several times unresponsively interpolated that he saw the defendant in the grill at eight-thirty or nine o'clock, and made a particular point of making it clear, by several repetitions, that it was absolutely impossible for a man to be in two places at once.

Mrs. Westlink, landlady of the Baranoff, testified that the the defendant was a family friend of some ten years' standing; that the hotel was in a rather bad neighborhood; and that they had to keep the entrance door locked, "so I put Mr. Demos in the room with the bell because he is a friend of mine. Lots of times when the children are out, he will answer the door and let them in." She also took up the story of the bills where Buck left off.

"Q. (By Mr. Garvin) Did you see Jim Buck that night? A. Jimmie Buck, yes. I seen Jimmie Buck earlier in the evening. I don't know what time it was,—I imagine about 6:30 or 7:00; I don't know for sure. I was downstairs. Of course, to get in he has to ring the bell. So he rang the bell and came in and he said he wanted to see one of the roomers upstairs. I told him to go upstairs. And after awhile he came downstairs. When he came down he said, 'Where is Jimmie; is he in?' I went over and knocked on the door and he was out. So he said, 'Well, I owe him a couple of dollars and I won't see him again tonight.' And I said, 'All right.' So I took the two dollars from him and went into the room and opened the drawer up and put the money in the drawer. In the top there is a letter slot and I just stuck it in and went on down again."

It will be noted that the last two sentences are somewhat inconsistent. The slot was in the dresser top.

It is clear that all the principal events dealt with occurred within a space of less than half an hour; that is, the giving of the bills to Buck, his visit to the hotel, and the arrest of the defendant. Only two of the officers were asked as to when these events occurred. One replied, about ten o'clock; the other, around ten or ten-thirty. Buck, however, said six-thirty, and Mrs. Westlink, it will be noted, aligned herself with that testimony. However, as we have hitherto seen, the alibi offered through the witness Dickson covers the period between eight-thirty and nine.

Mrs. Westlink further testified, most positively, that the officers did not open the trunk with a key of any sort, but pried off the hasp with an iron instrument which she furnished them. After much haggling, the trunk and a detached hasp were brought over from the Baranoff. It appeared that, at some time or other, a hasp had been pried off the trunk, and there is much argument concerning the force and alleged conclusiveness of this so-called physical evidence. However, at all times from the evening of the 25th day of August, 1943, when the officers removed the liquor from the trunk, until the trunk was brought into court in April, 1944, it was in the exclusive possession of the Westlinks, and the hasp could have been pried off in any two minutes of that more than seven months' period.

Mrs. Westlink further testified that, at the time of the seizure of the liquor, she claimed it as the property of herself and her husband, and the officers took her with it downstairs to the defendant's room. Thereupon, she testified, one of the officers urged the defendant to claim the liquor as his own, stating that they had him anyway on account of the partially filled bottle of whiskey in his room, and that, by so claiming it, he could save a woman from going to jail. The defendant thereupon accommodatingly, but falsely, admitted ownership of the liquor found in the trunk.

The defendant, called in his own defense, promptly aligned himself with the alibi witness, instead of Buck and Mrs. Westlink, by testifying that he was at the City Grill

from eight-thirty to nine o'clock. He went straight to the Baranoff which was only a few blocks away, paused after ascending the steps, and concluded to go up street and get a paper. He was arrested after about half a block. The four officers took him back to the hotel. He told them they would have to break the door to get in. They showed him a search warrant. He opened the outside door and the door to his room. He admitted that there was a bottle in his room with a small amount of whiskey in it; also, a number of mixer bottles. The officers demanded that he open the dresser drawer. He refused, but finally did so rather than have them break in. He testified that he made no reply whatever when asked where the two dollar bills, found in the dresser drawer, came from. They served the warrant after they got into the room. They went upstairs and found a lot of liquor belonging to the Westlinks, which, at the suggestion of one of the officers, he claimed as his own to save Mrs. Westlink from going to jail. He denied that any keys were taken from his room, or that he ever had a key which would open the trunk upstairs. The defendant admitted having served a term at Walla Walla, and a couple of convictions in police court.

The state recalled Officers Richardson and Westman, who testified that the trunk was not pried open or the padlock unlocked by a police key, but by a key found in the defendant's room and admitted by the defendant to be his. Officer Tembreull was recalled and testified that the partially filled bottle in evidence and admitted to contain whiskey, was the identical bottle and identical whiskey brought to him by Buck from the Baranoff.

Mrs. Westlink concluded the testimony in the case by testifying that there was no nail in the doorjamb of the defendant's room, or any indication that there had ever been one there.

The trial judge was of the opinion that the state's testimony established the charge, unless the officers were perjurers. As to that matter, he said:

"They have found a violation of the law which was their duty, if one existed, or they have deliberately and contrary

to their oath as officers,—not only framed an innocent man but have committed cold-blooded deliberate perjury in this Court. What more could you have? If they want to commit perjury, and frame an innocent man, there are a thousand men in town they can do it on. They don't need to pick out Jim Demos and frame him. There is no motive, so far as the testimony shows, of harming Jim Demos at all. There is no motive of framing him. So they have either lied—deliberately committed cold-blooded perjury, or they have done something which the law makes it their duty to do."

After discussing the evidence at length, the trial judge concluded as follows: "I am bound to find him guilty. I can't do anything else."

It is scarcely necessary to rely on the fact that the trial judge was in an infinitely better position to judge of the credibility of the witnesses than we can possibly be, for we think it sufficiently appears from the cold record alone that the state's case was consistent, reasonable, and believable, while the defense, although daringly conceived, was sadly deficient in execution and coordination, and reeks with improbability.

The judgment and sentence appealed from is affirmed.

SIMPSON, C. J., BLAKE, and BEALS, JJ., concur.

MALLERY, J. (dissenting)—This is wholly a circumstantial evidence case. Circumstantial evidence, in order to sustain a conviction, must meet the following requirements: The circumstances, themselves, must be proved beyond a reasonable doubt; they must all be consistent with each other and with the guilt of the accused; and they must be inconsistent with any reasonable hypothesis of innocence.

Evidence is not necessary to the formulation of such an hypothesis of innocence. The test is: Is it reasonable, not is it supported by evidence. The burden of proof of reasonableness is never shifted to the defendant. He has a right to require the state to prove circumstances inconsistent with any reasonable hypothesis of innocence. It may be formulated out of a clear sky, so to speak. All such hypotheses, however numerous, are available to the defendant. He need not elect between them nor offer evidence

in support of them. If he elects to support a particular hypothesis and is disbelieved, he must still be given the benefit of any hypothesis that is reasonable.

What are the circumstances? Jim Buck took two one-dollar bills into a hotel. The defendant had a room in the hotel. Jim Buck brought some intoxicating liquor out of the hotel. Shortly thereafter, the defendant had possession of the identical bills and had a key to a trunk containing fifty-four pints of whisky, fourteen bottles of rum, and some brandy which he admitted were his.

This must be held sufficient to sustain a conviction, if the conviction is to be sustained, even if the jury disbelieved every bit of the testimony offered on the defendant's behalf. Possession of the liquor alone is not enough to prove "intent to sell."

The question is: Did the defendant sell the liquor to Jim Buck? Money is a circulating medium of exchange. It passes through many hands for many purposes. The possessor of money cannot be presumed as a matter of law to have gotten it from any particular person or for any particular thing or purpose. I think the nature and function of money makes such a presumption unsound as a matter of law, because it is unsound as a matter of fact. Without such a presumption, the circumstances in this case are insufficient to sustain a conviction. The missing links, sought to be supplied by the presumptions, are: (1) That the defendant got the money from Jim Buck and not from anybody else; (2) that it was received as the purchase price of intoxicating liquor and not for some other purpose. And finally, from these two combined presumptions, it must be further inferred that the liquor in question was purchased from the defendant and not obtained from any other source or in any other way.

I think the state failed to prove its case.

The judgment should be reversed.